# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 15, 2019 Session

## STATE OF TENNESSEE v. DERRICK DARNELL MOORE and DEMICHAEL TYRONE MOORE

**Appeal from the Criminal Court for Davidson County**
**No. 2014-B-907     Steve R. Dozier, Judge**

**No. M2018-01764-CCA-R3-CD**

FILED

MAY 1 5 2020

Clerk of the Appellate Courts
Rec'd By _____

The Defendants, Derrick Darnell Moore and Demichael Tyrone Moore, were convicted by a Davidson County Criminal Court jury of first degree felony murder and especially aggravated robbery. *See* T.C.A. §§ 39-13-202 (2018) (first degree murder); 39-13-403 (2018) (especially aggravated robbery). Defendant Derrick Moore was also convicted of criminally negligent homicide, which the trial court merged into the felony murder conviction. *See id.* § 39-13-212 (2018) (criminally negligent homicide). Defendant Demichael Moore was also convicted of second degree murder, which the trial court likewise merged into the felony murder conviction. *See id.* § 39-13-210 (2018) (second degree murder). The trial court sentenced Defendant Derrick Moore to concurrent terms of life imprisonment for felony murder and twenty years for especially aggravated robbery. The trial court sentenced Defendant Demichael Moore to consecutive terms of life imprisonment for felony murder and thirty-two years for especially aggravated robbery. On appeal, the Defendants contend that (1) the evidence is insufficient to support their convictions, (2) the trial court violated the rules of evidence and their confrontation rights by admitting as substantive evidence a recording of a conversation in which the Defendants were implicated in the offenses, and (3) the State engaged in prosecutorial misconduct during its rebuttal closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Benjamin K. Raybin (on appeal) and Dwight Scott (at trial), Nashville, Tennessee, for the appellant, Derrick Darnell Moore.

Patrick T. McNally (on appeal) and Leah Wilson (at trial), Nashville, Tennessee, for the appellant, Demichael Tyrone Moore.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley and Ronald L. Coleman, Assistant Attorneys General; Glenn Funk, District Attorney General; and J. Wesley King and Kate Melby, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendants' convictions relate to the September 27, 2013 fatal shooting of Spencer Beasley. At the trial, Henry Howard, the victim's stepfather, testified that on September 27, the victim came home to take a shower after having finished work at Wendy's restaurant. Mr. Howard recalled that the victim received his paycheck on the day of the shooting and said that the victim received a cell phone call and left the home. Mr. Howard did not know to whom the victim spoke. Mr. Howard said that the victim did not have a car and that he did not hear a car pull into the driveway. On cross-examination, Mr. Howard stated that he did not see the victim with money before the victim left but that the victim received a paycheck each Friday.

Metro Nashville Police Officer Carlos Urrutia testified that he was the first officer to arrive at the scene of the shooting at approximately 7:00 p.m. and that the victim had suffered multiple gunshot wounds to his lower extremities. Officer Urrutia recalled that the victim was alive at the scene. Officer Urrutia did not see any weapons but saw cartridge casings, dice, and money.

Maurice Wiley testified that he and the victim, who was known as "Third," had been neighbors and had known each other for about four or five years at the time of the shooting. Mr. Wiley said that, on the day of the shooting, he picked up the victim from work "and brought him over there to where we was at." Mr. Wiley identified the victim's cell phone number. Mr. Wiley said that he was known by the names of "Sweet" and "Too Sweet."

Mr. Wiley testified that, after picking up the victim, Mr. Wiley drove the victim and Raymond Lenox, who was Mr. Wiley's cousin, to a dice game. Mr. Wiley said the three of them shot dice on the sidewalk, not far from Mr. Howard's home, beginning around 4:00 p.m. Mr. Wiley recalled that the victim had received his paycheck and had approximately $200 that day. Mr. Wiley described the dice game, in which one person rolled two dice, another person bet "against it," and bystanders placed side bets. Mr. Wiley said that, during the dice game, he received a cell phone call from David Miller, who was known as "Pun." Mr. Wiley stated Mr. Miller reported that a dice game was about to begin near Mr. Miller's home, which was located about a couple of minutes' drive from Mr. Wiley's home, and that Mr. Wiley, Mr. Lenox, and the victim went to the dice game near Mr. Miller's home.

Mr. Wiley testified that Defendant Demichael Moore, along with a few additional people whom Mr. Wiley could not identify, were present for the dice game near Mr.

-2-

Miller's home. Mr. Wiley thought two of the men might have been "Traco" and "Won." Mr. Wiley thought seven men were at the dice game, which was played along a stone wall in front of a home. He said that he and the victim each gambled and that Defendant Demichael Moore, whom Mr. Wiley knew as "Face," controlled the dice game. Mr. Wiley said that Defendant Demichael Moore collected a portion of the money because he controlled the game.

Mr. Wiley testified that Defendant Demichael Moore might have worn a "a button up collared shirt" at the time of the dice game. Mr. Wiley said that he stayed at the game for approximately thirty minutes and left after he received a cell phone call about his aunt. Mr. Wiley said that, when he left the dice game, there were no problems between any of the men and that the victim and Defendant Demichael Moore stayed behind. Mr. Wiley said that he returned to the dice game ten to fifteen minutes later because he received a call from Mr. Lenox, who reported that "they f----- up Third" and that "Face just shot [the victim]." Mr. Wiley said that when he returned to the dice game a couple of minutes after the call, nobody was at the scene but the victim. He said that the victim had been shot, that blood came from the victim's leg, and that the victim's eyes began to roll back into the victim's head. Mr. Wiley said he had not seen Defendant Derrick Moore at the scene.

Mr. Wiley testified that he called 9-1-1, that the police arrived about five minutes later, and that an ambulance took the victim to a hospital. Mr. Wiley said that although he was handicapped and did not have the use of his legs, his car had been "specially formatted" to allow him to drive despite his physical disability. Mr. Wiley stated that the victim did not have a firearm on the day of the shooting.

Mr. Wiley testified that, about ten minutes before he left the dice game, he saw Defendant Demichael Moore talking on a cell phone to Defendant Derrick Moore. Mr. Wiley said that he had known the Defendants, who were brothers, since childhood. Mr. Wiley said that although he and Defendant Demichael Moore were not friends, they had "no issues." Mr. Wiley said that Defendant Derrick Moore, who was also known as "Fat Derrick" and "Fat D," was "my partner" and that they had a good relationship. Mr. Wiley said that although the victim and Defendant Derrick Moore knew each other, they were not friends. Mr. Wiley said that, at an unspecified time before the day of the shooting, Defendant Derrick Moore stated he "had an issue" with the victim about a handgun that had been stolen from Defendant Derrick Moore. Mr. Wiley stated that Defendant Demichael Moore lived a couple of streets away from where the dice game occurred and that Defendant Derrick Moore lived in another portion of town.

Mr. Wiley identified photographs of the crime scene, which were received as an exhibit and which included the victim's Wendy's restaurant visor, the location of the dice game, what was described as a blood stain where the victim lay on the ground, and Mr. Wiley's car.

On cross-examination, Mr. Wiley agreed that Defendant Derrick Moore was not at the dice game when Mr. Wiley was there. Mr. Wiley denied telling the police that Mr. Lenox was at the scene when Mr. Wiley returned to find the victim lying on the street. Mr. Wiley said that Defendant Derrick Moore "had issues" with the victim because Defendant Derrick Moore believed the victim had stolen a handgun from Defendant Derrick Moore's friend but that Defendant Derrick Moore did not appear to be "very mad" about it. Mr. Wiley agreed that Defendant Derrick Moore never said he was "out to get" the victim.

Mr. Wiley testified that, before he left the dice game, Defendant Demichael Moore stated that Defendant Derrick Moore was "on his way" to the dice game. Mr. Wiley said that, to his knowledge, nobody had been drinking alcohol or had been under the influence of controlled substances at the dice game. He said that he and the victim shot dice daily. Mr. Wiley agreed that a dice game could "turn bad quickly" because money was at stake but that there were no problems when he left. Mr. Wiley said that he did not see Defendant Demichael Moore with a handgun at the dice game. Mr. Wiley agreed that Defendant Demichael Moore could have left and returned to the dice game during the time Mr. Wiley was gone from the game. Mr. Wiley doubted, though, that Defendant Demichael Moore left the dice game during this time.

Metro Nashville Police Detective William Mathis testified that he first responded to the scene at approximately 7:30 p.m., before going to the hospital to collect the victim's belongings. Detective Mathis said that a cell phone and money were not among the victim's belongings. On cross-examination, Detective Mathis stated a five-dollar bill and two cigar butts were found at the scene.

David Miller testified that his nickname was "Pun" and that he was confined at a Fayette County jail at the time of the trial. He did not recall the victim's name and the shooting at issue in this case, although he grew up in the area where the shooting occurred. He said that he had suffered a brain injury and "remember[ed] none of that stuff." He did not recall Defendant Demichael Moore's name but recalled a man known as "Face" and "D-Face." Mr. Miller initially could not identify the person he knew as Face in the courtroom but later identified Defendant Demichael Moore. Mr. Miller said that he went to school with Defendant Derrick Moore, whom Mr. Miller identified as "Fat-D" and Face's brother.

Mr. Miller testified that he recalled "nothing about no shooting on that situation" and did not recall anything relative to September 2013. When asked what he recalled before September 2013, he said that he recalled living with his father in 2014. He said that he could not recall anything before 2014 and that he had used a lot of drugs. He said that his brain injury occurred during a 2014 fight.

Mr. Miller testified that he was not concerned about being labeled a "snitch." He denied feigning memory loss about the 2013 shooting and stated that he genuinely did not

-4-

recall it. He did not recall speaking with detectives about the shooting on September 28, 2013, riding in a car with the detectives in the neighborhood where the shooting occurred, and telling the detectives what he saw.

On cross-examination, Mr. Miller testified relative to his previous drug use that he had used cocaine, marijuana, and heroin "as much as [he] could all day every day." He said that if a recording showed him speaking to the police about the victim's shooting, he was "[p]robably . . . trying to get some money or something" to purchase drugs. He agreed he would have been using cocaine and heroin at the time of the interview and that he would have been intoxicated. On redirect examination, Mr. Miller denied using drugs at the time of the trial.

Metro Nashville Police Crime Scene Officer Warren Fleak testified that he responded to the scene around 10:00 p.m. He identified photographs of the scene, which included two green dice, two partially smoked cigars, a black cell phone charger, a Wendy's restaurant apron and visor, a .45-caliber cartridge casing beside the visor, a .45-caliber cartridge casing above the visor on top of a concrete wall, nine additional .45-caliber cartridge casings throughout the scene, a bullet fragment near the visor, a five-dollar bill, and a bullet fragment lying in what he described as blood. On cross-examination, Officer Fleak stated that the cartridge casings and bullet fragments did not establish the identity of the shooter or where the shooter stood at the time of the shooting.

Tennessee Bureau of Investigation (TBI) Agent Teri Arney, an expert in the fields of firearms and tool mark analyses, testified that she analyzed four bullets and two bullet fragments, along with twelve cartridge casings found at the scene. Agent Arney stated that all of the cartridge casings were Remington brand .45-caliber and had been fired from the same handgun. She said that the four bullets were .45-caliber and were typical of Remington cartridges but that she was unable to conclude that the bullets were fired from a particular handgun. He said that the rifling was of a poor quality, which prevented a conclusion that the bullets were fired from the same handgun. She said, though, it was possible the twelve cartridge casings were fired from the same handgun as the four bullets. She said that the bullet fragments had the same class characteristics as the four bullets and that the copper jackets of the fragments were consistent with Remington.

Agent Arney concluded that the .45-caliber cartridge casings found at the scene had been fired from the same .45-caliber handgun and had characteristics of having been fired from a semi-automatic Glock firearm. She likewise concluded that the bullets and bullet fragments were consistent with having been fired from a .45-caliber Glock handgun. On cross-examination, Agent Arney testified that the handgun used in this case was not provided to her.

TBI Agent Greg Fort, an expert in the field of DNA analysis, determined that Defendant Demichael Moore's DNA was on two cigar butts found at the scene. Agent Fort

said that a mixture of two DNA profiles was found on one of the butts and that the minor DNA contributor was Defendant Demichael Moore. On cross-examination, Agent Fort stated that an unidentified person's DNA was also found on the butt. He agreed that he could not determine when Defendant Demichael Moore's DNA was transferred to the butt.

Metro Nashville Police Detective Adam Weeks testified that he interviewed Mr. Miller, who was also known by the nicknames "Pun," "C-Pun," and "Little David," the day after the victim's death. Detective Weeks said that he spoke to Mr. Miller at the scene initially and later inside his police car. Detective Weeks said that Mr. Miller initially denied having any knowledge about the shooting but that Mr. Miller requested a meeting when the detective recanvassed the area.

Detective Weeks testified that he and Detective Curtis Haifley picked up Mr. Miller where the shooting occurred, that Mr. Miller had a nervous and concerned demeanor, and that Mr. Miller appeared apprehensive about speaking to the police. Detective Weeks said that Mr. Miller did not appear to have been under the influence of any substances. Their audio-recorded conversation was played for the jury.

In the recording, Mr. Miller stated that he was going to show the detectives the home of the person "who done it" in exchange for payment. A detective stated they could discuss "that," but Crime Stoppers paid tipsters. Mr. Miller expressed fear for his life for talking to the detectives and said that he needed to be paid immediately for the information he wanted to provide them. They discussed the anonymous nature of Crime Stoppers and the maximum amount of money Crime Stoppers would pay for information, and Mr. Miller asked for the telephone number.

Mr. Miller directed the detective to drive to a home near the scene of the shooting. He said that the shooter's name was Demichael and was known as "D-Face." Mr. Miller did not know Demichael's last name but identified Defendant Derrick Moore as Demichael's brother. Mr. Miller directed the detective to drive to a home that Mr. Miller said was owned by Defendant Demichael Moore's mother and said Defendant Demichael Moore lived at the home. When the detective asked what occurred before the shooting, Mr. Miller said that the victim had stolen a gun from "a guy" and that that guy "finally caught up with" the victim.

Mr. Miller stated that he witnessed the shooting and that, "I was out there, man. I didn't want to say I was out there, yes I was out there." Mr. Miller said that Defendant Demichael Moore aimed the handgun at the victim. When the detective asked if Defendant Demichael Moore had tried to kill the victim, Mr. Miller stated, "But he ran off with dude pistol that's why he did it." The detective asked who was present during the shooting, and Mr. Miller said that he did not know but that many people were shooting dice. When the detective asked if Mr. Wiley had been at the scene, Mr. Miller said that Mr. Wiley dropped off the victim but that Mr. Wiley was not at the scene when the shooting occurred. Mr.

Miller said that "Raymond" was shooting dice when the gunshots began but that Dejuan Teasley was not at the scene.

Mr. Miller said that Defendant Demichael Moore only fired the handgun at the victim. Mr. Miller said that Defendant Demichael Moore "took up for Derrick, his brother. Because [the victim] took [h]is brother's gun. [Derrick] pulled a pistol out on him last night when they was shooting dice." Mr. Miller said that the victim "almost took Derrick's pistol and D-Face ran up and got the pistol and put it on [the victim]." When the detective asked why Defendant Derrick Moore pointed a handgun at the victim, Mr. Miller said that a couple of months before the shooting, the victim "took" Defendant Derrick Moore's pistol "and ran off." Mr. Miller said that Defendant Derrick Moore finally "caught" the victim. Mr. Miller said that Defendant Demichael Moore "just saved" his brother. Mr. Miller said that Defendant Derrick Moore "upped on" the victim, that the men struggled for the handgun, and that Defendant Demichael Moore intervened and shot the victim. Mr. Miller said that although Defendant Demichael Moore shot the victim, the handgun belonged to Defendant Derrick Moore.

Detective Weeks testified that, during the interview, he drove past the home Mr. Miller identified as Defendant Demichael Moore's home, which was about two blocks from the scene. Detective Weeks said that Defendant Derrick Moore lived near a college campus. Detective Weeks said the victim's cell phone had not been found. Detective Weeks said that, in late September, he and Detective Paul Harris interviewed Defendant Derrick Moore. Detective Weeks said that Detective Harris and Defendant Derrick Moore had a cordial relationship before this case. The audio recording of the interview was played for the jury.

In the recording, Defendant Derrick Moore stated that in January or February, the victim and other unidentified people had robbed Defendant Derrick Moore but that he did not "do anything about it." Defendant Derrick Moore denied that he had been looking for the victim and said that he had spoken to the victim, along with a man known as "Get-Get," two weeks before the interview. Defendant Derrick Moore said that he later spoke to Get-Get, who reported that the victim thought Defendant Derrick Moore was going to shoot the victim. Defendant Derrick Moore said that the robbery involved thirty or forty dollars and that if he "wanted to get" the victim, he "would've . . . got him or had to call, whatever . . . that's petty s--- you live and you learn." He said that the victim's "day [had been] coming" because "you can only rob, steal, break in houses for so long." Defendant Derrick Moore said he told Get-Get that the victim would go to jail eventually.

Defendant Derrick Moore stated that, on the day of the shooting, he drove to east Nashville after work to visit his parents. He said he checked the mail, spoke to his father, spoke to his brother, Defendant Demichael Moore, and left the house. Defendant Derrick Moore said that he saw the victim, along with fifteen to twenty additional people, shooting dice on the street corner as he left his parents' neighborhood. Defendant Derrick Moore

-7-

said that he "jumped out of the car" when he saw the victim, retrieved a hammer from the car, hid it in his shirt sleeve, and approached the victim. Defendant Derrick Moore said he had the hammer because he did not know if the victim was armed. Defendant Derrick Moore said that his car, which belonged to his mother, was parked "around back," that the hammer was inside the car, and that the detectives could look at the hammer. Defendant Derrick Moore said that he and the victim said, "What's up?" to each other, that they "squared off," and that he grabbed the victim. Defendant Derrick Moore described the altercation as "tussling" and said that the next thing he heard was five or six gunshots, that he ducked, that he thought he had been shot, that everyone ran, and that he drove home. He said that he "still had hands on" victim when the shooting began and that the victim was standing when Defendant Derrick Moore ran to his car. Defendant Derrick Moore said that the shots came from behind, that he never looked back, that he ran to his car, and that he drove home.

Defendant Derrick Moore stated that numerous people had called him, reporting various stories of what had occurred. When the detectives asked about the substance of those stories, he said people were saying that he "put a hit out on" the victim. Defendant Derrick Moore denied hiring someone to kill the victim "over some s--- from six months ago and I can find [the victim] whenever I get ready." Defendant Derrick Moore said that other stories included that the victim was "ganged" and was run over by a car.

Defendant Derrick Moore stated that he did not know who fired the shots because he did not look. He said that he and the victim wrestled, that nobody was able to "throw any blows," and that he did not have any scratches or injuries. He said that he placed the victim in a headlock, that the victim "broke loose," that they "sparred back up," and that he heard gunshots. He said that "Pun" and "Trayco" were at the scene when he arrived but that he could not identify any of the remaining people because he focused on the victim. Defendant Derrick Moore denied having a handgun when the shooting occurred and said Defendant Demichael Moore was not at the scene. Defendant Derrick Moore said his wife "changed" him "from the streets to in the house."

Defendant Derrick Moore stated that, when he approached the victim, he only wanted the money the victim had taken and that he had the hammer because he did not know if the victim had a handgun. He denied intending to use the hammer in order to get his money. He said he happened to see the victim wearing a red Wendy's shirt and denied he had been looking for the victim.

Defendant Derrick Moore stated that, months before the shooting, he and the victim participated in a dice game, that the victim "hit my pointer," and that he wanted the money he won. He said that the victim stated the victim "caught 'em" and pulled out a handgun. Defendant Derrick Moore said that the victim took approximately thirty to forty dollars at gunpoint and fled the area.

-8-

Defendant Derrick Moore stated that, on the night of the shooting, he arrived home around 7:45 p.m. and that he spoke to Defendant Demichael Moore at approximately 8:00 p.m. He said that between 9:00 p.m. and 10:00 p.m., his father and Defendant Demichael Moore came to his home to talk about what had occurred.

Defendant Derrick Moore consented to the detectives' retrieving the hammer from his car. He stated that he had the hammer because he did not know if the victim had a handgun but that he never saw the victim display a gun. He said that the victim had one hand on the hammer during the struggle. Defendant Derrick Moore said that he arrived home at 6:30 p.m. after work and that he drove to his parents' home, arriving around 7:00 p.m.

The detective told Defendant Derrick Moore that multiple witnesses reported that he had a handgun when he approached the victim, not a hammer, and that the incident was related to a previous robbery of a handgun, not money. Defendant Derrick Moore said that he knew about a robbery of a handgun but that the handgun was not stolen from him. He said that the gun "wasn't even the issue" and that, as a result, he did not mention it. He admitted, though, his altercation with the victim was about "a past beef." The detective asked if Defendant Demichael Moore shot the victim after seeing him fight with the victim, and Defendant Derrick Moore said that his brother was not at the scene.

Defendant Derrick Moore denied talking on the phone to his brother and exchanging text messages just before arriving at the dice game but said he spoke with his wife and brother earlier in the day. He offered to allow the detectives to review his wife's cell phone to confirm when he spoke to her. He denied speaking with Defendant Demichael Moore about the shooting and provided the detective with two telephone numbers connected to Defendant Demichael Moore after attempting to call Defendant Demichael Moore during the interview.

The detective told Defendant Derrick Moore that the victim was executed based upon at least six gunshot wounds and the thirteen cartridge casings found at the scene. Defendant Derrick Moore denied owning and carrying a handgun. He said that he did not know who shot the victim and that he could not recall every person at the scene. The detective asked, "How many other people you know would shoot a guy for you," and Defendant Derrick Moore responded, "Anybody out there." Defendant Derrick Moore said, "Anything I want to happen I can make happen . . . I just don't condone . . . that s--- no more." He said that he and his brother were "on two separate pages."

Detective Weeks testified that Defendant Derrick Moore did not identify Defendant Demichael Moore as having been at the scene. Detective Weeks identified the hammer recovered from Defendant Derrick Moore's car.

-9-

Detective Weeks testified that he obtained a DNA sample from Defendant Derrick Moore and conducted a second interview with him in November 2013. Detective Weeks said that, during the interview, he confronted Defendant Derrick Moore about having taken the victim's property during the shooting and about information related to the victim's cell phone records. Detective Weeks explained that cell phone records showed that, after the time of the shooting, the victim's phone used cell phone towers "moving away from the crime scene," which led Detective Weeks to conclude that the victim's phone was moving after the shooting. A portion of the audio-recorded interview was played for the jury.

In the recording, the detective asked Defendant Derrick Moore why the victim's cell phone would have "show[ed] up on the way to your house," and Defendant Derrick Moore said, "I didn't take nothing, I didn't take nothing. I didn't take, I didn't get a chance." He denied taking money, keys, and a cell phone. He said, "So if you saying they was showing up on the way to my house I'll find them, but you'll have to tell me . . . . I mean, not like that, but I just don't see that happening. I was by myself when I left. My phone was dead."

Detective Weeks testified that in October 2013, he interviewed Defendant Demichael Moore, who stated he had been at home when the shooting occurred and at Defendant Derrick Moore's home afterward. Detective Weeks said that Defendant Demichael Moore described Defendant Derrick Moore as agitated and "freaking out." Detective Weeks obtained Defendant Demichael Moore's DNA.

Detective Weeks identified Defendant Demichael Moore's cell phone number, records of which were received as an exhibit. Detective Weeks stated that Defendant Demichael Moore provided his phone number, although the phone belonged to Defendant Demichael Moore's father, Steven Brown. Detective Weeks identified a cell phone number previously associated with Defendant Demichael Moore, records of which were received as an exhibit. Detective Weeks identified another cell phone number associated with Defendant Demichael Moore, and the corresponding records were received as an exhibit. Detective Weeks identified Defendant Derrick Moore's cell phone number, records of which were received as an exhibit. The victim's cell phone records were, likewise, received as an exhibit.

Detective Weeks testified that the cell phone number previously associated with Defendant Demichael Moore was "active" at the time of the shooting but was deactivated in the early morning hours on the day after the shooting. Detective Weeks said that a third cell phone number associated with Defendant Demichael Moore was activated on September 28, 2013, at 7:48 a.m., which was the day after the shooting. Detective Weeks said that, during his investigation, Defendant Demichael Moore contacted him from the number activated on the day after the shooting.

On cross-examination, Detective Weeks testified that Mr. Miller did not appear to have animosity toward the Defendants and agreed that Defendant Derrick Moore reported

having "let go" of a previous incident during which a gun was "pulled" on Defendant Derrick Moore. Detective Weeks said that Defendant Derrick Moore reported stopping at the scene to recover a debt from the victim, that he retrieved the hammer because the victim was known to carry a handgun, that he hid the hammer in his shirt sleeve, and that he was initially unable to use the hammer against the victim in an effort to recover the debt. Detective Weeks agreed that as Defendant Derrick Moore approached the dice game, he and the victim fought, that Defendant Derrick Moore placed the victim in a "headlock," and that someone shot the victim as the men were "wrestling" on the ground. Detective Weeks did not think Defendant Derrick Moore shot the victim.

Detective Weeks testified, though, that Defendant Derrick Moore intended "to take things" from the victim and had planned to obtain a weapon before he approached the victim. Detective Weeks agreed the direct evidence did not show that Defendant Derrick Moore took anything from the victim, "[o]nly that someone did." Detective Weeks disputed that any of the ten to twelve people at the dice game could have taken the victim's belongings as everyone fled the scene during the shooting. Detective Weeks said that "there is the potential . . . opportunity I believe exists . . . where things could be removed" by Defendant Derrick Moore. Detective Weeks agreed a five-dollar bill was found at the scene.

Detective Weeks testified that Mr. Miller was the only witness who "put the gun in" Defendant Derrick Moore's hand. Detective Weeks agreed that a search of Defendant Derrick Moore's home did not result in locating evidence connected to the shooting. Detective Weeks agreed that multiple witnesses falsely identified Defendant Derrick Moore as the shooter.

Detective Weeks testified that a search of Defendant Demichael Moore's home did not produce any evidence connected to the victim's death. Detective Weeks said that Defendant Derrick Moore identified Defendant Demichael Moore's cell phone number as the number that was active at the time of the shooting but was deactivated in the early morning hours on the day following the shooting.

Metro Nashville Police Detective Joseph High, an expert in cell phone call detail record analysis, testified that he reviewed data related to four cell phone numbers. He reviewed records between September 13, 2013, and October 3, 2013, related to the victim's phone, Defendant Demichael Moore's two phones, and Defendant Derrick Moore's phone. His report was received as an exhibit. Detective High stated that Defendant Demichael Moore's phone placed calls at 5:06 p.m., 5:08 p.m., and 5:14 p.m. on the day of the shooting, and that the phone used a cell tower near the crime scene. Detective High said that a second phone associated with Defendant Demichael Moore placed an outgoing call a few minutes later and used the same cell tower. Detective High stated that the victim's cell phone placed three calls around the same time and that the phone used the same cell

tower. Detective High said that the victim's cell phone used the same tower again at 6:02 p.m. and 6:18 p.m.

Detective High testified that, at 6:46 p.m., Defendant Derrick Moore's cell phone placed an outgoing call to Defendant Demichael Moore's phone and that the phone used different cell towers during the call, indicating that the phone was traveling toward the crime scene. Detective High said that, at 7:26 p.m., Defendant Demichael Moore's phone attempted to place a call to Defendant Derrick Moore's phone and that later Defendant Demichael Moore's phone used a cell tower on the opposite side of town away from the scene. Detective High said that by 8:00 p.m., Defendant Derrick Moore's phone used a tower near Defendant Derrick Moore's home and that Defendant Demichael Moore's phone used a tower near Defendant Demichael Moore's home. Detective High said that the victim's cell phone did not reflect activity after 6:23 p.m. but that the victim's phone received multiple incoming calls, which were likely unanswered based upon the short durations, around 8:30 p.m. Detective High's report showed that, at the time these calls occurred after the shooting, the victim's cell phone used a different tower than the tower located near the scene and that the tower was located between Defendant Derrick Moore's home and the scene.

On cross-examination, Detective High testified that the data did not identify who placed and received cell phone calls and did not reveal the substance of any conversation. He agreed the records did not identify the specific locations of the cell phones.

Dr. Adele Lewis, chief medical examiner and an expert in forensic pathology, testified that she performed the victim's autopsy. She determined that the cause of death was multiple gunshot wounds and that the manner of death was homicide. She stated that the victim had been shot five times in the right leg, eight times in the left leg, and once in the left hand. She said that the gunshot wounds damaged the victim's femoral artery, causing excessive blood loss, oxygen deprivation, and brain death. The autopsy report and photographs were received as exhibits. On cross-examination, Dr. Lewis testified that she found only one abrasion on the victim and that she saw no evidence showing the victim had been in a fight before the shooting.

Steven Brown, the Defendants' father, testified on behalf of the defense that Defendant Demichael Moore lived with him. Mr. Brown said that Defendant Demichael Moore was at home when Mr. Brown arrived around 5:00 p.m. on the day of the shooting. Mr. Brown said that Defendant Demichael Moore played music and talked on his cell phone from his bedroom and that Defendant Derrick Moore arrived at the home around 6:25 p.m. Mr. Brown said that, after talking for a few minutes, Defendant Derrick Moore entered Defendant Demichael Moore's bedroom. Mr. Brown said that Defendant Derrick Moore stayed approximately twenty minutes and that he next saw Defendant Demichael Moore around 9:20 p.m. Mr. Brown said that he heard Defendant Demichael Moore "in the refrigerator" about twenty minutes after Defendant Derrick Moore left. Mr. Brown

said that he drove to Defendant Derrick Moore's home later that night because he heard Defendant Derrick Moore had been "involved in a situation."

On cross-examination, Mr. Brown testified that his home was about a ten-minute walk from the crime scene. He knew Defendant Demichael Moore gambled. Mr. Brown said that, at the time of the shooting, he had two cell phones and that Defendant Demichael Moore used one of them. Mr. Brown said that he received a phone call on the night of the shooting as he walked toward the scene to investigate the "blue lights." Mr. Brown clarified that Defendant Derrick Moore did not own a car but that friends drove him. Mr. Brown said that he left home for Defendant Derrick Moore's home at approximately 10:00 p.m. and that Defendant Demichael Moore left the home at the same time with Mr. Brown's daughter, who also drove to Defendant Derrick Moore's home.

Mr. Brown testified that he went to Defendant Derrick Moore's home at around 10:00 p.m. because of the shooting, that he and Defendant Demichael Moore stayed for about two hours, and that they attempted to "find out what happened." Mr. Brown said Defendant Derrick Moore appeared calm.

Upon this evidence, the jury convicted the Defendant Derrick Moore of felony murder, criminally negligent homicide, and especially aggravated robbery. The jury convicted Defendant Demichael Moore of first degree felony murder, second degree murder, and especially aggravated robbery. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendants contend that the evidence is insufficient to support their convictions. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331

S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

## A.    Felony Murder and Especially Aggravated Robbery

The Defendants were convicted of felony murder and especially aggravated robbery. As relevant to the present case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). Especially aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear" which is "[a]ccomplished with a deadly weapon" and in which "the victim suffers serious bodily injury." *Id.* §§ 39-13-401(a) (2018), -403(a)(1)-(2).

In the light most favorable to the State, the evidence reflects that the victim left home with his cell phone and approximately $200 to participate in the dice game. Mr. Wiley, who drove the victim to the dice game, identified Defendant Demichael Moore as the game's controller, and DNA evidence from cigar butts placed Defendant Demichael Moore at the scene. When Mr. Wiley was at the game, Defendant Demichael Moore talked to Defendant Derrick Moore on the phone and reported that Defendant Derrick Moore was "on his way" to the game. Cell phone records supported Mr. Wiley's testimony in this regard. When Defendant Derrick Moore arrived at the game, Mr. Miller saw Defendant Derrick Moore pull out a handgun and point it at the victim. Defendant Derrick Moore and the victim struggled, and the victim almost took the handgun away from Defendant Derrick Moore. However, Defendant Demichael Moore took the handgun, pointed it only at the victim, and fired it multiple times. Approximately twelve cartridge casings were recovered from the scene, and the victim sustained fourteen gunshot wounds during the shooting. The victim's money and cell phone were never recovered. However, cell phone records reflect that, before the shooting, the victim's phone used a tower near the scene but that, after the shooting, the victim's cell phone used a different tower located between the scene and Defendant Derrick Moore's home. Although Mr. Miller and Mr. Wiley stated that the victim had taken Defendant Derrick Moore's handgun during a robbery a few months before the shooting, Defendant Derrick Moore admitted during his police interview that he approached the victim at the dice game with the intent to take money from the victim, who previously robbed Defendant Derrick Moore at gunpoint.

We conclude that the evidence is sufficient to support the Defendants' convictions for especially aggravated robbery and first degree felony murder. The evidence showed that Defendant Demichael Moore contacted Defendant Derrick Moore from the dice game and that Defendant Derrick Moore arrived at the game afterward. Furthermore, Defendant Derrick Moore obtained a handgun before leaving his car and approached the victim with the intent to take money from the victim. As the Defendant Derrick Moore attempted to

take money from the victim, an altercation ensued, and Defendant Demichael Moore took the handgun and shot the victim multiple times, resulting in the victim's death.

In determining that the evidence is sufficient to support the especially aggravated robbery convictions, we have not overlooked the Defendants' argument that the victim's cell phone and money were not recovered from their respective homes. Cell phone records reflect, though, that the victim's phone used a cell tower near Defendant Derrick Moore's home after the shooting. The jury could have reasonably inferred from this circumstantial evidence that Defendant Derrick Moore had taken the victim's money and cell phone. *See Dorantes*, 331 S.W.3d at 386. The Defendants are not entitled to relief on this basis.

## B. Criminally Negligent Homicide

Defendant Derrick Moore was convicted of criminally negligent homicide. Criminally negligent homicide is defined as "[c]riminally negligent conduct that results in death." T.C.A. § 39-13-212.

> 'Criminal negligence' refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

*Id.* § 39-11-106(a)(4) (2018); *see State v. Slater*, 841 S.W.2d 841, 842 (Tenn. Crim. App. 1992); *State v. Owens*, 820 S.W.2d 757, 760-61 (Tenn. Crim. App. 1991). "[T]he evidence can show an intentional or knowing killing which is unjustified or a killing which was proximately caused by reckless or criminally negligent conduct." *State v. Butler*, 880 S.W.2d 395, 398 (Tenn. Crim. App. 1994); *see State v. Jones*, 151 S.W.3d 494, 499 (Tenn. 2004); *State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001).

In the light most favorable to the State, the evidence reflects that Defendant Demichael Moore contacted Defendant Derrick Moore from the dice game, and Defendant Derrick Moore arrived at the game afterward. Furthermore, Defendant Derrick Moore obtained a handgun before leaving his car and approached the victim with the intent to take money from the victim. An altercation ensued, and Defendant Demichael Moore took the gun and shot the victim multiple times, resulting in the victim's death.

We conclude that the evidence supports a determination that Defendant Derrick Moore either failed to perceive or perceived and disregarded the substantial and unjustifiable risk of bodily harm and death created by his displaying a handgun to

-15-

accomplish a robbery. The evidence supports a jury's determination that Defendant Derrick Moore's bringing a handgun to commit a robbery created a substantial and unjustifiable risk of bodily injury or death to the victim. Furthermore, even if Defendant Derrick Moore had not intended to harm the victim, Defendant Derrick Moore's conduct created a substantial and unjustifiable risk to the victim. The evidence supports a determination that Defendant Derrick Moore was aware of, but disregarded, the risk created by displaying a firearm at the victim and that his failure to perceive the risk was a gross deviation from the standard of care that an ordinary person would exercise. Defendant Derrick Moore is not entitled to relief on this basis.

## C. Second Degree Murder

Defendant Demichael Moore was convicted of second degree murder, which is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In the light most favorable to the State, the evidence reflects that Defendant Derrick Moore brought a handgun to take money from the victim, and an altercation between the victim and Defendant Derrick Moore occurred. During the altercation, Defendant Demichael Moore obtained the handgun, pointed it at the victim, and fired it multiple times, resulting in the victim's sustaining fourteen gunshot wounds and in the victim's death. We conclude that evidence is sufficient to establish that Defendant Demichael Moore acted with an awareness that his conduct was reasonably certain to cause the victim's death. Defendant Demichael Moore is not entitled to relief on this basis.

## II. Admission of Mr. Miller's Recorded Statement

The Defendants contend that the trial court erred by admitting as substantive evidence the recording of Mr. Miller's police statement. The Defendants argue that the statement was inadmissible hearsay and that its admission violated their confrontation rights. The State responds that the trial court properly determined that the recording was admissible as a prior inconsistent statement and that the recording did not violate the Defendants' confrontation rights.

At the trial, Mr. Miller testified that he had suffered a brain injury and had no recollection of 2013 when the shooting occurred. Mr. Miller, likewise, did not recall speaking to the police on the day after the shooting. Detective Weeks testified that, on the day after the shooting, he and Detective Curtis Haifley picked up Mr. Miller from where

the shooting occurred, that Mr. Miller had a nervous and concerned demeanor, that Mr. Miller expressed fear for his life, and that Mr. Miller was apprehensive about speaking to the police. Detective Weeks testified that Mr. Miller did not appear to have been under the influence of any substances. Detective Weeks said that he recorded their conversation, although he did not inform Mr. Miller of the recording. The State requested permission to play the recording, and the Defendants objected.

At the jury-out hearing, defense counsel questioned Detective Weeks about the recording. Detective Weeks stated that Mr. Miller initially denied having any information about the shooting. Detective Weeks agreed that Mr. Miller asked for "any sort of reward money" in exchange for information about the shooting. Detective Weeks did not recall Mr. Miller's financial condition but agreed it was possible Mr. Miller stated he would help the police if the police paid him. Detective Weeks stated that his usual practice was to record witness statements and that he rarely requested a witness provide a written statement.

Defense counsel argued that Mr. Miller's recorded statement was inadmissible as a prior inconsistent statement pursuant to Tennessee Rule of Evidence 803(26) because the recording lacked an indication of trustworthiness. Counsel argued that the statement was made the day after the shooting, that Mr. Miller previously denied having any knowledge about the shooting, and that there was "no telling how many street stories" Mr. Miller had heard between the time of the shooting and when he spoke to the detectives. Counsel noted that Mr. Miller was an admitted drug user at the time of the shooting and "decided to sell the information" and that Mr. Miller now denied having any recollection of his conversation with the detectives, the shooting, and the dice game. Counsel argued that Mr. Miller "could have and would have manufactured the story from what he heard on the street" because Mr. Miller wanted money. Counsel likewise argued that admission of the recording violated the Defendants' confrontation rights.

The prosecutor argued that the recording was substantive evidence as a prior inconsistent statement and that Detective Weeks' testimony established the trustworthiness of Mr. Miller's recorded statement. The prosecutor noted that, in the recording, the detectives "quickly dispelled the fact that Mr. Miller would be receiving any money from this interview notwithstanding that . . . Mr. Miller goes ahead and tells them about the shooting." The prosecutor did not address whether admission of the recording violated the Defendants' confrontation rights.

The trial court noted that the purpose of the prior inconsistent statement exception to the rule barring the admission to hearsay evidence was to allow testimony in domestic violence and gang-related cases in which witnesses became reluctant to testify. The court determined that the conversation was preserved as an audio recording, that Mr. Miller had testified at the trial, and that Mr. Miller lacked sufficient memory at the time of the trial. The court concluded that the State had established by a preponderance of the evidence that

-17-

the statement was made under circumstances indicating trustworthiness. The court found that Mr. Miller expressed concern in the recording that his name would be revealed, which supported the trustworthiness of the statement, that Mr. Miller was adamant about the identity of the shooter and the events leading to the shooting, and that the detectives verified the information provided by Mr. Miller. The court found that Mr. Miller discussed "riffs" about a stolen gun belonging to Defendant Derrick Moore, which was consistent with Mr. Wiley's testimony, stated that the victim was shot twelve times, which was consistent with the number of cartridge casings found at the scene, and said that Mr. Wiley dropped off the victim at the scene, which was consistent with Mr. Wiley's testimony. The court determined that Mr. Miller's statement did not involve "street stories" and that the evidence did not show Mr. Miller was paid for his statement. The court found that, in the recording, the detectives referred Mr. Miller to Crime Stoppers. The court also determined that Mr. Miller was articulate and coherent in the recording and did not display any indication of intoxication. The court stated that the prior inconsistent statement hearsay exception could be applied when a witness had a lack of memory or recollection. The court determined that the substance of Mr. Miller's recorded statement was inconsistent with his trial testimony because he did not recall the shooting and speaking with the police about the shooting the day after it occurred. The court determined that the recording was admissible as a prior inconsistent statement and that the Defendants' confrontation rights would not be violated by its admission.

## A.    Prior Inconsistent Statements

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. One such exception pertains to prior inconsistent statements of a testifying witness.

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded the opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admission of a party-opponent as defined in Rule 803(1.2).

Tenn. R. Evid. 613(b). A hearsay exception exists for:

> A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:
>
> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

-18-

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). Our supreme court has determined that "a prior statement about events that a witness claims at trial to be unable to remember is 'inconsistent' with the witness' trial testimony," regardless of whether the memory loss is genuine, feigned, or exaggerated. *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015).

A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

In the present case, Mr. Miller's police statement was audio recorded by Detective Weeks the day after the shooting. Mr. Miller testified at the trial that he had suffered a brain injury and had no recollection of 2013 when the shooting occurred. Mr. Miller, likewise, did not recall speaking to the police about the shooting. Defense counsel cross-examined Mr. Miller. Therefore, the requirements of Tennessee Rule of Evidence 803(26) were satisfied.

Likewise, the record supports the trial court's determination that the statement was made pursuant to circumstances indicating trustworthiness. Although Mr. Miller testified at the trial that he used drugs at the time of the shooting, Mr. Wiley testified that nobody at the dice game appeared to be under the influence of alcohol or controlled substances. Likewise, Detective Weeks testified that Mr. Miller did not appear to be under the influence of drugs at the time of the interview, and Mr. Miller was clear and coherent in the recording. Detective Weeks testified that Mr. Miller had a nervous and concerned demeanor, had been apprehensive to speak with the police, expressed fear for his life because he was speaking to the police, and wanted assurances that he would not be identified as a witness to the shooting. Although Mr. Miller wanted money in exchange for his statement, the detectives explained that Crime Stoppers paid any reward and that the detectives could not pay Mr. Miller in exchange for information. Mr. Miller spoke to the detectives without receiving money. Mr. Miller was unequivocal about the shooter's identity and about the events leading to and during the shooting. Mr. Miller discussed the previous robbery between the victim and Defendant Derrick Moore, which was consistent with Mr. Wiley's testimony. Likewise, Mr. Miller stated that Mr. Wiley dropped off the victim at the dice game and that Mr. Wiley left the scene before the shooting occurred, all of which was consistent with Mr. Wiley's testimony. Mr. Miller discussed the numerous times the victim had been shot,

-19-

which was consistent with the medical examiner's testimony and with the cartridge casings recovered from the scene. Furthermore, the detectives continued to investigate the shooting after speaking with Mr. Miller to verify the information he provided.

The trial court followed the mandates of Tennessee Rule of Evidence 803(26), and the record supports the court's determinations. Therefore, we conclude that the court did not err by admitting Mr. Miller's audio-recorded statement as substantive evidence. The Defendants are not entitled to relief on this basis.

## B.    Confrontation Clause

The Confrontation Clause provides a criminal defendant the right to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *State v. McCoy*, 459 S.W.1, 13-14 (Tenn. 2014), our supreme court said that Article I, section 9 of the Tennessee Constitution placed no additional restrictions on the admission of hearsay statements beyond the limits of the federal constitution, as explained in *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Thus, the same standards apply in interpreting a defendant's confrontation rights under the state and federal constitutions. *See State v. Hutchison*, 482 S.W.3d 893, 905 (Tenn. 2016). In analyzing whether an out-of-court statement is barred by the Confrontation Clause, inquiry begins with "whether the challenged statement is testimonial." *See id.*; *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014). The Confrontation Clause has no bearing on the admission of statements which are nontestimonial hearsay. *Hutchison*, 482 S.W.3d at 905-06 (citing *Davis v. Washington*, 547 U.S. 813, 823–24 (2006)); *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014). Thus, the admissibility of a nontestimonial statement is determined by the traditional rules regarding the admission of hearsay evidence. *State v. Cannon*, 254 S.W.3d 287, 303 (Tenn. 2008); *see Davis*, 547 U.S. at 821.

A precise definition of what constitutes a testimonial statement has proven elusive. *See, e.g., Williams v. Illinois*, 567 U.S. 50 (2012) (proposing, in a plurality and two separate opinions, three methods for determining whether a statement is testimonial); *Dotson*, 450 S.W.3d at 68-70 (noting the difficulty of discerning a cohesive, narrow rule from the fractured opinions of the *Williams* court). Recently, our supreme court analyzed *Williams* and prescribed a framework for determining which evidence is testimonial. *See Dotson*, 450 S.W.3d at 69. In this regard, a statement is testimonial "'if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.'" *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)); *see Hutchison*, 482 S.W.3d at 910.

In determining what statements are testimonial, our supreme court has also looked to the examples provided by *Crawford*:

Various formulations of this core class of "testimonial" statements exist: "*ex*

*parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

*Hutchison*, 482 S.W.3d at 906 (quoting *Crawford*, 541 U.S. at 51-52).

In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-55; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). However, the Confrontation Clause is not implicated when testimonial statements are not used to show the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9. Similarly, no Confrontation Clause violation occurs if the declarant is called as a trial witness and is subject to cross-examination regarding the declarant's prior testimonial statements. *See Dotson*, 450 S.W.3d at 73; *see also Crawford*, 541 U.S. at 59, n.9; *California v. Green*, 399 U.S. 149, 162 (1970).

Although Mr. Miller's audio-recorded statement contains admissible hearsay evidence pursuant to the rules of evidence, our inquiry must include whether admission of the statement violated the Defendants' confrontation rights. The record reflects that the statement's primary purpose was substantive evidence of the Defendants' guilt and that the statement was a targeted accusation against the Defendants. Therefore, the statement was testimonial. *See Dotson*, 450 S.W.3d at 69. However, Mr. Miller testified at the trial, and the Defendants had the opportunity to cross-examine him. Our supreme court has determined that "even when a trial court admits a witness' hearsay statements as substantive evidence, and the witness claims at trial not to remember the information contained within the hearsay statements, the Confrontation Clause is not violated when a defendant has an opportunity to cross-examine the witness at trial." *State v. Davis*, 466 S.W.3d 49, 69 (Tenn. 2015). As a result, the trial court did not err by determining that admission of the recording did not violate the Defendants' confrontation rights. The Defendants are not entitled to relief on this basis.

## III. Prosecutorial Misconduct

The Defendants contend that prosecutorial misconduct occurred during the State's rebuttal argument because the prosecutor misstated the legal standard for felony murder and stated that Defendant Derrick Moore had confessed to felony murder. The Defendants argue that the prosecutor's comments prejudiced the outcome of the trial. The State responds that the prosecutor's comments were not improper because the prosecutor referenced Defendant Derrick Moore's admissions during his police interview and the requirements for establishing felony murder. We agree with the State.

As a preliminary matter, the Defendants concede that the defense did not object contemporaneously during the State's rebuttal argument, although the issue was raised in the motions for a new trial. The Defendants request that we review this issue for plain error, and as a result, we limit our review accordingly. *See State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010).

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see Jordan*, 325 S.W.3d at 64. A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d

at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340,

344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

The Defendants point to the following during the State's rebuttal argument:

> Derrick Moore again at [its] most basic level in this case, Derrick Moore admitted to felony murder. Derrick Moore admitted that he was going to get his money back. Derrick Moore admitted that he had a deadly weapon. He didn't have the claw hammer, that's what he says he had, but even if you believed Derrick Moore's version of events, Derrick Moore admits to the crime of felony murder. He was going to attempt a robbery and he had . . . a deadly weapon, and during that somebody was killed. So he admits to felony murder.

We conclude that the Defendants have failed to prove that a clear and unequivocal rule of law was breached. *See Adkisson*, 899 S.W.2d at 640-41. The prosecutor's argument focused on Defendant Derrick Moore's admission to the detectives that, while armed with a deadly weapon, he intended to take money from the victim and that the victim had stolen from him previously. Regardless of whether the jury credited Defendant Derrick Moore's admission that he was armed with a claw hammer or the witness testimony that Defendant Derrick Moore was armed with a handgun, the evidence showed that he possessed a deadly weapon to accomplish a robbery and that the victim was fatally shot during the incident. The prosecutor's argument reflects the logical inferences to be drawn from the evidence that Defendant Derrick Moore's admissions were sufficient to satisfy the elements of first degree felony murder. Additionally, during closing arguments, the parties discussed the Defendants' criminal responsibility for each other's conduct, and the trial court provided an instruction for criminal responsibility in the final jury charge. The Defendants are not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE